MG(CA) Jay M. Coggan (Bar No. 86107)
jay.coggan@stateguard.cmd.ca.gov
Col (CA) T. Scott Belden (Bar No. 184387)
scott.belden@stateguard.cmd.ca.gov
1LT (CA) Jessica L. Zamora (Bar No. 315169)
Jessica.zamora@stateguard.cmd.ca.gov
California State Guard
California Military Department
Mailing Address:
P.O. Box 9129
Bakersfield, California 93389
Telephone: (661) 864-7826

Attorneys for Plaintiffs
MSG WADE H. SCOTT and APRIL S. SCOTT

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WADE H. SCOTT and APRIL S. SCOTT,<br><br>Plaintiffs,<br><br>vs.<br><br>NAVY FEDERAL CREDIT UNION; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1) **VIOLATIONS OF CALIFORNIA MILITARY & VETERANS CODE SECTION 800**<br>2) **VIOLATIONS OF THE SERVICEMEMBERS' CIVIL RELIEF ACT**<br>3) **ILLEGAL AND UNFAIR PRACTICES – BUSINESS & PROFESSIONS CODE SECTION 17200**<br>4) **BREACH OF CONTRACT**<br>5) **BREACH OF THE IMPLIED COVENENT OF GOOD FAITH AND FAIR DEALING** |

6) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
7) **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
8) **VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**

**JURY TRIAL DEMANDED**

Plaintiffs MSG WADE SCOTT and APRIL SCOTT (collectively "MSG Scott and Mrs. Scott" or the "Scotts") allege against Defendants NAVY FEDERAL CREDIT UNION (NFCU) and DOES 1 through 50, inclusive, as follows:

## SUMMARY OF THE ACTION

1. The Scotts incurred a mortgage to purchase their family home in Corona, California in 2003 and in 2017, refinanced their mortgage with NFCU. Wade Scott is a soldier in the California National Guard. He has served his country on four combat tours in Iraq and Afghanistan and counting. Relevant to this Complaint is MSG Scott's deployment that began on January 26, 2018. MSG Scott deployed in support of ongoing combat operations in Afghanistan. During MSG Scott's deployment, the Scotts requested from Defendants protections that exist under California and federal law for service members who are called to active duty military service. These protections including, among other things, a deferral of mortgage payments for six months, limitations on interest and late fees, and protections from foreclosure and adverse credit reporting. The Defendants received the Scotts' requests for the protections to which they were entitled. Unfortunately, Defendant refused to follow the law. Instead of granting the required deferral or limiting interest and late fees, the Defendants harassed the Scotts into continuing to make payments, charged excessive interest and improper fees, and threatened foreclosure.

///

///

2.     Defendants' conduct is particularly egregious because the Scotts received numerous calls a day, were sent letters of default, had money out taken out of their checking account without authorization, and were constantly threatened to have their home foreclosed, all while MSG Scott remained in active duty. Mrs. Scott would constantly reach out to NFCU but they simply ignored her. Even the NFCU manager at the Corona branch reached out to their headquarters to no avail. Defendants also knew that the strain of MSG Scott's deployment on the Scotts. Throughout that time, the Scotts repeatedly requested the financial protections to which they are entitled under the law. And each of the Defendants continued to refuse to grant those protections. Through this action, the Scotts intend to recover from Defendant all damages the Scotts incurred as a result of Defendants' improper actions and failures to follow the law.

## PARTIES

3.     Plaintiff WADE SCOTT ("MSG Scott") is an individual serving as a member of the California Army National Guard. MSG Scott is now, and at all time mentioned in this Complaint was, a resident of the State of California, County of Riverside.

4.     Plaintiff APRIL SCOTT ("Mrs. Scott") is an individual and the spouse of co-plaintiff MSG Scott. Mrs. Scott is now, and at all time mentioned in this Complaint was, residing in the State of California, County of Riverside.

5.     Defendant NAVY FEDERAL CREDIT UNION ("NFCU") is a national bank with its headquarters and principal place of business located in Vienna, Virginia. Among other things, NFCU is engaged in the business of home mortgages/loans to consumers, including Plaintiffs. NFCU also operates banking centers, and thus conducts business, throughout the State of California and the United States.

6.     The true names and capacities of Defendants referred to in this Complaint as DOES 1 to 50, inclusive, and each of them, are unknown to MSG Scott and Mrs. Scott at this time. MSG Scott and Mrs. Scott are informed and believe that defendants

DOES 1 through 50, inclusive, are in some way responsible for the injury and damages incurred. MSG & Mrs. Scott will amend this Complaint to allege the true names and capacities of DOES 1 to 50 when ascertained. Collectively, NFCU, and DOES 1 to 50, inclusive, are referred to as "Defendants."

7.     MSG Scott and Mrs. Scott are informed and believe, and allege that at all material times each of the Defendants were the agents, servants, directors, managers or employees of the co-defendants, and in doing or omitting the things alleged in this Complaint were acting in an agency, managerial or employment capacity within the course and scope of their authorities, and their acts and conduct were with the permission and consent of the co-defendants. MSG Scott and Mrs. Scott are informed and believe, and therefore allege that each of the conduct by the individual Defendants that was outside the scope of their authority was known to, authorized and ratified by the co-defendants.

8.     MSG Scott and Mrs. Scott are further informed, believe, and allege that each Defendant designated as a DOE was responsible, negligently, or in some other actionable manner, for the events and happening referred to in this Complaint, which directly or proximately caused injury and damages to MSG Scott and Mrs. Scott.

**JURISDICTION AND VENUE**

9.     The Court has personal jurisdiction over each of the Defendants pursuant to 28 U.S.C. § 1391 because NFCU conducts business in the Central District of California, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district. Specifically, the wrongful acts and omissions described in this Complaint occurred within the jurisdiction of this Court and concern real properly located within this District. Moreover, the Scotts' claims under the Servicemembers' Civil Relief Act and Fair Credit Reporting Act arise under the laws of the United States, which this Court has jurisdiction over under 28 U.S.C. § 1331.

///

3

## THE LAW PROTECTS CITIZEN-SOLDIERS WHEN CALLED TO ACTIVE DUTY SERVICE

10.     A citizen-soldier faces significant stress and financial consequences when called to serve in a hostile combat zone for prolonged periods. This is particularly so for National Guard soldiers, who are typically older than active duty soldiers and are more likely to leave behind families—and fixed financial obligations—when they deploy. For these reasons, law provides financial protections for citizen soldiers when their country calls on them to serve in a combat zone.

### I.     Protections Afforded Under the California Military & Veterans Code § 800

11.     California Military & Veterans Code section 800(a) provides that "any member of the United States Military Reserve or the National Guard of this state who is called to active duty after the enactment of this chapter as a part of the Iraq and Afghanistan conflicts may defer payments on any of the following obligations while serving on active duty: (1)  An obligation secured by a mortgage or deed of trust." Under California law, a deployed soldier's mortgage obligation is deferred for "the lesser of 180 days or the period of active duty plus 60 calendar day." Military & Veterans Code § 800(d).[1]

12.     Moreover, under Cal. Mil. & Vet. Code § 409.3, an action to enforce a servicemember's real property obligation payable in installments under a purchase contract or secured by a mortgage (or other security) may be deferred for a period equal to the period of military service, as statutorily specified.

13.     California law also makes clear that during the deferral period: "No penalties shall be imposed on the nonpayment of principal or interest during this period.   No interest shall be charged or accumulated on the principal or interest on

---

[1] California Military and Veterans Code sections 800 and 405 were amended effective January 1, 2019. Stats. 2018, ch. 79 § 1; Stats. 2018, ch. 555, § 18.5. Unless noted otherwise for comparison purposes, references in this Complaint are to the version of those codes that were in effect during the relevant time period before January 1, 2019.

which the payment was delayed.   No foreclosure or repossession of property on which payment has been deferred shall take place during the period specified in Section 800." Military & Veterans Code § 804. These protections apply to a National Guard soldier, as well as his or her spouse or legal dependent, who are likewise protected under Section 800. Military & Veterans Code § 811.

14.     Moreover, a deferral under Section 800 "shall not provide the basis for affecting credit ratings, denial or revocation of credit, or a change by the lender in the terms of an existing credit arrangement." Military & Veterans Code § 805.

15.     Even if the mortgage obligation is sold, "any requirement to defer payments as specified in [Section 800] transfers to the purchaser of the obligation." Military & Veterans Code § 810.

16.     CMVC Section 800 permits the deferral of "an obligation secured by a mortgage or deed of trust," among other obligations, owed by a "reservist who is called to active duty." Cal Mil & Vet Code § 800(a)(1). Unlike other sections of the CMVC or the SCRA, Section 800 does not incorporate a "before military service" qualifier on the obligations protected by that provision. To the contrary, the definition of "mortgage" is set out in Section 801, which defines a mortgage as "an obligation secured by a mortgage or deed of trust for residential property owned by a reservist and used as that reservist's primary place of residence on the date the reservist was ordered to active duty." Cal. Military & Veterans Code § 801.

17.     Unless otherwise agreed by the parties following nonpayment or a breach, or unless previously court-ordered, state law prohibits any sale, foreclosure or seizure of a servicemember's secured real property during his or her military service and for one year thereafter. Cal. Mil. & Vet. Code § 408(c).

18.     California prohibited the exercise of a right under contract to rescind or terminate the contract or to retake possession for nonpayment or other breach by a service member or dependent except in a court of competent jurisdiction. Cal. Mil. & Vet. Code §§ 407(a), 409.5. In such an action, the court may permit the exercise of

these rights on conditions or may stay the proceedings or make other orders as may be equitable to conserve the interests of all parties. Cal. Mil. & Vet. Code § 407(b). Similarly, no sale, foreclosure or seizure of property, owned by a service member or dependent at the commencement of military service and at the time of default, for nonpayment of any tax assessment or payment due under a mortgage, deed of trust or other security in the nature of a mortgage on real or personal property is valid during the period of military service or for nine months thereafter except pursuant to an agreement of the parties or an order of the court, and the service member may request the court to extend the mortgage or deed of trust for a period of time equal to the period of military service. Cal. Mil. & Vet. Code §§ 408(c), 409.2, 409.3(d), 409.5.

## II. Protections Afforded Under the Servicemembers Civil Relief Act

19.     Federal law also provides protections to citizen-soldiers under the Servicemembers Civil Relief Act (the "SCRA"). The SCRA was first enacted in 1940 with the intent to "provide for, strengthen, and expedite the national defense through protection extended by [the SCRA] . . . to servicemembers of the United State to enable such persons to devote their entire energy to the defense needs of the Nation." 50 U.S.C. § 502(1).

20.     The SCRA includes limitations on judicial proceedings, including attempts to foreclose on property while a member of the armed forces is on active duty. 50 U.S.C. § 501 *et seq*. The Supreme Court has dictated that the limitations in the SCRA, as well as other protections for active duty servicemembers, are "always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." *Boone v. Lightner*, 319 U.S. 561, 575 (1943). As such, "the Act must be read with an eye friendly to those who dropped their affairs to answer their country's call." *LeMaistre v. Leffers*, 333 U.S. 1, 6 (1948). This liberal interpretation applicable to the SCRA applies equally to the state-law equivalent of found in the California Military & Veterans Code.

///

COMPLAINT

21.     The Ninth Circuit has recognized that the SCRA "sets a serious prohibition aimed at keeping members of the armed forces free of foreclosures which would be distractions and unfair while they serve their country." *Brewster v. SunTrust Mortgage, Inc.*, 742 F.3d 876, 878 (9th Cir. 2014). This includes a prohibition on any sale, foreclosure, or seizure of property during or within one year of a servicemember's military service. 50 U.S.C. app. § 533(c). A violation or **attempted** violation of that prohibition can be punished through fine or imprisonment, and private plaintiffs may receive equitable relief, monetary damages, and attorneys' fees. 50 U.S.C. app. §§ 533(d), 597a.

22.     In an action to enforce an obligation on real or personal property owned by the debtor that (i) is secured by mortgage, trust deed or other security in the nature of a mortgage and (ii) originated prior to military service and for which the debtor is still obligated, filed during the period of military service or within one year thereafter, the court may, after a hearing and on its own motion, and *shall* on application by the debtor when his or her ability to comply is materially affected by military service: stay the proceedings "for a period of time as justice and equity require"; or adjust the obligation "to preserve the interests of all parties." 50 USC § 3953(a), (b).

23.     Additional specific protections provided by the SCRA also include limitations on interest and fees that may be charged and protections to affect servicemembers' future financial transactions. 50 U.S.C. App. §§ 518, 527(b)(2), 533.

## NFCU FAILED TO COMPLY WITH THE SCOTT'S MULTIPLE DEFERRAL REQUESTS

24.     In 2017, the Scotts refinanced their purchase money mortgage in the amount of $260,000.00 ("the Loan") for their home that is located at 27538 Eastwind Drive, Corona, California 92883 (the "Property"). The Loan was backed by a written agreement between the Scotts and NFCU. The Loan bore a VA fixed interest rate of 3.250%. The loan was evidenced by a mortgage, deed of trust and security deed that were each dated July 31, 2017. (collectively the "Loan Agreement").

25.     On January 29, 2018, MSG Scott was called to active duty to serve in Afghanistan.

26.     On April 4, 2018, Mrs. Scott sent NFCU a message through their online messaging system, requesting the protections afforded to the Scotts under both the SCRA and CMVC for their accounts, including a 6-month deferral of the Scott's mortgage obligation that was held by NFCU, as well as a reduction on the interest charged on the Scott's truck loan (not to exceed 6%), credit card payments and personal loan. As part of her request, the Mrs. Scott provided a copy of MSG Scott's military orders calling him to active duty service in Afghanistan.

27.     On April 6, 2018, a NFCU representative responded that it will take one to two business days to determine whether the documentation provided by Mrs. Scott was acceptable and that she should receive a letter in 10 to 14 business days.

28.     On April 16, 2018, Mrs. Scott followed up on her request from April 6, 2018, once again attaching all of MSG Scott's orders and explaining their financial hardship, as MSG Scott was not earning the same money as he would be if was not currently on active duty.

29.     A letter from NFCU dated April 17, 2018, stated that they had processed the Scotts' request for relief under the provisions of the SCRA for their mortgage account. NFCU's letter stated that "because the interest rates for the mortgage loan(s) listed below is equal to or below 6%, we will not make a rate adjustment and, as a result, no adjustments to the current scheduled monthly payments were made."  The Scotts' monthly mortgage payment for the Loan remained at $1,438.05, even after Ms. Scott provided MSG Scott's orders noting that he was deployed in Afghanistan and requesting the protections afforded to them under both state and federal law.

30.     On April 18, 2018, a NFCU representative followed up with Mrs. Scott and informed her that they were still determining her eligibility for relief under the SCRA and that any overpayment in interest the Scotts have paid on eligible accounts would be refunded to them.

31.     On April 19, 2018, Mrs. Scott again messaged NFCU and reiterated that MSG Scott had been deployed since January 2018. She again requested the protections under both the SCRA and CMVC on the Scott's accounts and attached MSG Scott's orders to her message. She explained that California law provides a six-month deferment on mortgage payments.

32.     On April 23, 2018, a NFCU representative informed Mrs. Scott that her accounts with NFCU did not qualify for the protections under the law because MSG Scott was only an "authorized user" on the account. Most importantly, Defendants did not take any steps to defer the loan.

33.     On May 1, 2018, Mrs. Scott submitted a packet through the NFCU online messaging system, that contained signed forms titled "RE: Request for Deferral of Payment Obligation California Military and Veterans Code §§ 800-805" for all of the Scott's NFCU accounts, including their mortgage loan. The packet also included MSG Scott's orders dated November 6, 2017, that indicated that he was to report to Joint Forces Training Base Los Alamitos on January 26, 2018 and later report to Fort Bragg Army Base on January 29, 2018.

34.     That same day, Mrs. Scott received a letter from NFCU dated April 18, 2018. Instead of abiding by the law, and deferring the Scott's mortgage payment, NFCU's letter indicated that the Scott's monthly credit card and consumer loan interest would be reduced to 6%, but deferment was granted.

35.     Mrs. Scott then called NFCU. A NFCU representative informed Mrs. Scott that the overage interest she had paid towards the above loans was put towards her principal balance of the Scott's accounts. Mrs. Scott, unaware of this, asked for the overage interest to be put into the Scott's checking account. Mrs. Scott once again explained that MSG Scott's deployment had caused a financial hardship as he was receiving a lower pay while he was deployed and they had a loss of over $2,000 a month, as he was not working multiple jobs like, he used to prior to deployment.

///

COMPLAINT

36.     On May 3, 2018, Mrs. Scott and the Scott's son, Brenden Scott, personally handed the packet entitled "RE: Request for Deferral of Payment Obligation California Military and Veterans Code §§ 800-805" to the Corona NFCU Branch manager.  The manager scanned the packet and submitted it to NFCU through her online system.

37.     While at the branch, the manager called the NFCU's SCRA department to confirm they had received the package.  The manager then proceeded to hand the phone to Mrs. Scott and she spoke to a NFCU representative, Youlondia Armstead ("Ms. Armstead"). Ms. Armstead told Mrs. Scott that any overage interest on the Scotts' accounts would be applied to their account's principal balance and not their checking account. During their conversation, Ms. Armstead disclosed that the reasoning for adding the overage interest into a servicemember's principle balance was to help servicemembers pay off their debt faster. Mrs. Scott told Ms. Armstead that that was untrue as the law was enacted to help servicemembers make their monthly payments due to their reduced pay.  Unfortunately, Ms. Armstead was very rude to Mrs. Scott and she left the branch in tears.

38.     On May 16, 2018, Mrs. Scott spoke to a NFCU representative, Jean, who informed her that she could not talk to her due to the Scott's cease and desist letter. Mrs. Scott explained that the reason she sent the letter was because she was getting collection calls (up to ten a day), emails, and letters (up to six a day at a time). Jean directed Mrs. Scott to speak to her attorney, as NFCU cannot directly speak to her. The following day, Jean called Mrs. Scott and informed her that she was still working on the Scott's request.

39.     On May 21, 2018, Mrs. Scott messaged NFCU once again pleading that NFCU provide them with the protections under both the SCRA and CMVC. At the same time, Mrs. Scott made sure to inform them that the manager at the Corona Branch had also sent them several letters and messages on the Scott's behalf. She requested for any overage interest payment to be refunded into the Scott's checking

account and not the principal balance. She reminded NFCU that the Scott's payments were supposed to be lowered not to exceed 6% pursuant with the law. She also informed them that NFCU had continued to ignore her requests. Instead of complying with the law, NFCU would call numerous times a day, email them default notices, and take money out of their checking accounts without authorization. Mrs. Scott begged for the harassing phone calls and emails and the collection letters to stop as it was causing her extreme distress.

40.  That same day, Mrs. Scott also sent an email to the collection department at NFCU.  Mrs. Scott once again requested the protections afforded the Scotts under California law.

41.  On May 22, 2018, a NFCU representative informed Mrs. Scott to be patient as they will soon respond to her request.

42.  The following day, NFCU declined to grant the Scotts' relief as to their credit cards because NFCU's interpretation of the SCRA only applied to debt incurred by an active duty military member either as an individual or jointly with a spouse. NFCU said that MSG Scott was an "authorized user" on Mrs. Scott's account and was not considered incurring the debt. NFCU said that her credit card will not be covered under the SCRA.  They also said that the overage interest that she has paid would be deposited into a joint/share checking account and that the deferred payments request were still being reviewed.

43.  On May 23, 2018, Mrs. Scott thank NFCU for their response and asked when the Scott's overage of interest above 6% will be refunded back to them.  Mrs. Scott explained to NFCU that any interest that exceeded 6% were to be forgiven and deposited into the active duty member's checking account.

44.  That same day, Mrs. Scott also requested that NFCU stop taking money out of the Scott's account whenever they wanted without authorization or she would have MSG Scott's checks deposited at a different bank.

///

COMPLAINT

45.     On May 24, 2018, NFCU representative, Ms. Armstead, returned Mrs. Scott's call. Mrs. Scott inquired as to $900 that was deposited into the Scott's checking account. She also asked NFCU to stop taking money out of the Scott's accounts whenever they wanted to or she would have no other choice but to deposit MSG Scott's checks at another bank.  Mrs. Scott informed Ms. Armstead that NFCU did not have permission to take money out of their accounts whenever they wanted to. Mrs. Scott also inquired as to her numerous mortgage loan deferment requests.

46.     On May 25, 2018, NFCU sent Mrs. Scott a ten-page packet they want her to fill out to request hardship assistance.

47.     The following day, Mrs. Scott responded to NFCU that she was not requesting any hardship assistance, but for them to abide by California Law. Mrs. Scott informed NFCU that nowhere in the language of the CMVC does it state that she had to fill out all of NFCU's paperwork. Mrs. Scott once again inquired as to where the overpaid interest was notated on the Scott's accounts and that it was supposed to be forgiven.  Mrs. Scott also express her regret in joining their bank.

48.     On May 30, 2018, Mrs. Scott spoke with Ms. Armstead as the Scotts were not getting their overage interest refunded back to them and explained that the CMVC did not indicate that the overage interest was to be put in the principal of the loans. Mrs. Scott ultimately told Ms. Armstead to put any overage interest into the Scott's next payments.  Ms. Armstead instructed Mrs. Scott to use MSG Scott's messaging system to informed NFCU to take the overage interest off the principle balance and put it towards the Scott's next payments, even though she would not have any payments at all if they granted her requests for deferment of payments in the first place. NFCU later requested that MSG Scott personally call them from Afghanistan if the Scotts needed assistance.

///

///

///

COMPLAINT

49.     Later that day, Mrs. Scott messaged NFCU agreeing to put the overage of interest on their next month payments for the loans.  She also expressed to NFCU that she wanted the overage interest refund to be applied to the loan before the loans went 30 days late.

50.     On June 1, 2018, a NFCU representative responded to Mrs. Scott message informing her that NFCU they noted she was using MSG Scott's sign in information to gain access to their e-messaging system.  Mrs. Scott responded that she was her husband's Power of Attorney ("POA") and would continue to use his log in information to care for his accounts as she cannot see them in her account page. She also informed the NFCU representative that Ms. Armstead advised her to reply to NFCU by using MSG Scott's credentials.

51.     On August 8, 2018, Mrs. Scott was forced to evacuate her home due to the Holy Fire burning towards the Scott's home. She returned home on August 11, 2018 and had significant damage to the Scott's home.

52.     Instead of complying with Mrs. Scott's request that NFCU abide by both state and federal law, on both January 7, 2019 and February 5, 2019, NFCU continued efforts to collect on the Scott's mortgage by sending letters to them that said that the payment amount required to bring their account current was $2,944.28, which included past due monthly payments, late charges and costs. Once again, Defendants did not take any steps to defer the Scott's loan.

53.     After receiving numerous requests for a deferral under California Military & Veterans Code Section 800, ***NFCU denied the Scotts' request***. On February 15, 2019, the Scotts received from NFCU a letter titled "Notice of Default and Intent to Accelerate". In the letter, NFCU threaten to accelerate the maturity date of the mortgage account, declare the total balance immediately due and payable and terminate the Scott's ownership in the property by a foreclosure proceeding if NFCU did not receive payment of $2,944.28.

///

13

54.     On February 27, 2019, Mrs. Scott continued to plead with NFCU to abide by California law. She sent NFCU a copy of the original CMCV request, and MSG Scott's Kaiser W-2 from 2018 showing he only made a couple hundred dollars from Kaiser that whole year. Unfortunately, she had lost track of all of NFCU payment requests as she was caring for both her children and her terminally ill mother. She also attached a letter where she explained that she was so confused as to what was owed to NFCU as they kept changing the amounts owed.  She informed NFCU that MSG Scott was activated to deploy to Afghanistan in January 2018 but his orders were extended until September 2019. Mrs. Scott also explained that she would make a payment on their automated system and it informed her that she had to make another one. Also, she communicated to NFCU that due to their refusal to provide any deferral on the Scott's accounts, their credit score had been destroyed. Instead of following the law, NFCU would constantly harass the Scotts as they would send them constant threats of foreclosing on their home which had caused extreme emotional distress on the family. She once again begged NFCU to abide by the law and stop taking money out of their checking account whenever they wanted.

55.     On March 1, 2019, NFCU responded that a SCRA supervisor would give Mrs. Scott a call. Mrs. Scott responded back that if NFCU was going to call her to harass, degrade, or deny the Scott's request, to please not call and put the denial in writing.

56.     On March 5, 2019, Mrs. Scott received a message from a NFCU representative that it was their understanding that her problem had been taken care of during a telephone conversation.

///

///

///

///

///

57.     On March 8, 2019, Mrs. Scott messaged NFCU to informed them that their representative, Amanda Meyer ("Ms. Meyer"), never called her and that a payment for the Scott's personal loan was taken out of MSG Scott's checking account without their permission. This withdrawal took the only money available out of MSG Scott's account and an overdraft fee was charged. Most importantly, NFCU left MSG Scott with no money in his account while he was away in Afghanistan.

58.     On March 12, 2019, Mrs. Scott messaged NFCU and addressed the message to Ms. Meyer. Mrs. Scott informed her that NFCU took out a payment out of MSG Scott's checking account without permission causing an overdraft fee of $20. She asked Ms. Meyer to look into it.

59.     On March 19, 2019, Mrs. Scott's mother passed away and as she was grieving, she also had to deal with NFCU harassing phone calls, emails and letters. Over a series of emails, Mrs. Scott informed Ms. Meyer that the Scott's credit report had a notation of late payments which caused their credit score to drop. Mrs. Scott attached screenshots of the credit reports to her messages.  Ms. Meyer informed Mrs. Scott that she needed time to review the credit and that it would take time to fix.  Mrs. Scott pointed out that the "late payments" annotation had been there since January 2018.  The Scott's credit scores used to be in the high 600s and at the time they were in the low 500s.

60.     On April 2, 2019, the Scotts and NFCU entered into a deferment agreement (the "Deferment Agreement"). The Deferment Agreement deferred the Scott's payments of the principal and interest on their loans for a period of six (6) months from January 1, 2019 until June 30, 2019. The Scott's monthly periodic payments would resume on July 1, 2019.  Additionally, NFCU continued to report delinquencies on MSG Scott's credit report.

///

///

///

COMPLAINT

1      61.    Even though NFCU entered into an agreement with the Scotts that they

2   would defer their mortgage payments until June 30, 2019, on May 7, 2019, Mrs. Scott

3   received a letter from Veteran's Affairs that NFCU had informed them that the Scott's

4   mortgage loan payment was past due.

5      62.    On July 1, 2019, contrary to the Deferment Agreement, NFCU sent the

6   Scotts several letters stating that their loan was sixty days past due.  As per the

7   Deferment Agreement, the Scott's payments were to resume on July 1, 2019.

8      63.    On July 25, 2019, Mrs. Scott notified NFCU of the letter she received

9   from the VA stating that the Scott's mortgage was late.  She informed them that the

10   notice was mailed to the Scott's while their mortgage was on deferment. Mrs. Scott

11   also addressed that on MSG Scott's credit report, there was a 150 day late notation

12   while the loan was deferred.

13      64.    On August 19, 2019, Mrs. Scott sent NFCU several messages through

14   their online messaging system.  The first message was regarding NFCU stating that

15   Mrs. Scott's credit card was over the limit.  She explained that NFCU continued to

16   charge her interest in excess of 6%, in violation of the CMVC, which explained why

17   her credit card was over the limit. On the second message, Mrs. Scott cited and

18   provided NFCU with a copy of sections from the California Military and Veterans

19   Code and inquired as to why her account balances were increasing if NCFU was not

20   charging interest.  On the third message, Mrs. Scott informed them that charging

21   additional interest in excess of 6% on the Scott's credit cards put them over the limit

22   which was lowering their credit cores.

23      65.    On August 21, 2019, an NFCU representative finally responded to Mrs.

24   Scott's messages and instructed her to have MSG Scott contact them so they may

25   better assist them.

26      ///

27      ///

28      ///

COMPLAINT

66.     On August 22, 2019, Mrs. Scott responded that she was MSG Scott's POA and asked if they really wanted MSG Scott to call them from Afghanistan. She reiterated that she had been pleading with them to abide by the CMVC for over a year but at this point she had no choice but to contact JAG for assistance.

67.     On September 21, 2019, Mrs. Scott requested that NFCU abided by the SCRA and attached MSG Scott's extension orders with an updated executed Power of Attorney. On September 23, 2019, NFCU responded that they had received the documents and would process them in 3 to 5 business days.

68.     On September 26, 2019, Mrs. Scott followed up on her previous message.

69.     On September 30, 2019, MSG Scott's orders were extended to January 7, 2020.

70.     On October 15, 2019, Mrs. Scott requested that the Scott's NFCU accounts be updated with MSG Scott's new orders through NFCU's online messaging system.  She informed them that she had emailed their representative, Ms. Meyer, the orders in September and did not know why the interest rate in their account reverted back to the original interest rate.

71.     On October 16, 2019, NFCU increased the Scott's non-mortgage loan payments.

72.     On December 6, 2019, Mrs. Scott received a letter from NFCU, indicating that in order to bring the Scott's mortgage account current, they had to pay $3,136.28, even after Ms. Scott provided MSG Scott's orders notating that he was deployed in Afghanistan and numerous requests for the protections afforded to them under both state and federal law.

73.     On January 15, 2020, MSG Scott was ordered to return to active duty from January 13, 2020 to September 30, 2020. MSG Scott remained on active duty until that day.

74.     On January 17, 2020, Mrs. Scott notified NFCU that MSG Scott was put on a new set of title 32 orders and requested deferment on their loans.

75.     On January 24, 2020, NFCU notified Mrs. Scott that it would take 65 business days to respond to her requests.

76.     On February 12, 2020, Mrs. Scott spoke to NFCU representative, Jennifer P, and requested protections under the law for the Scott's accounts. Jennifer P told Mrs. Scott she would get back to her. Mrs. Scott explained to her that she had come to an agreement with NFCU agreement in April of 2019, where NFCU would waive all of the accrued interest on all of the Scott's debts which they listed on the agreement. Jennifer P said she would look into the Scott's request but she never did.

77.     Later in February 2020, Mrs. Scott noticed that their credit cards, truck, and personal loans were being deferred and a payment was not due on those accounts until August 12, 2020, but their mortgage payment was not deferred. Instead of deferring the Scott's mortgage payments they were being increased to $2,046 a month, when their last monthly payment was only $1,536.

78.     Since then, Mrs. Scott has sent NFCU 4 messages inquiring as to why the Scott's mortgage payment was so high but she never received any messages in return. Mrs. Scott has also called NFCU but she is usually kept on hold, waiting up to an hour with no response.

79.     Even though the Scott's have timely made their escrow payment each month and have no past due balance owed on their mortgage, NFCU sent them a letter stating that the payment amount required to make their account current was $7,347.47 on December 7, 2020. NFCU falsely noted that this amount included past monthly payments beginning November 2, 2020 and subsequent monthly payments, late charges and costs through December 7, 2020, thereby causing the Scott's to fear that that NFCU will foreclose on their home.

80.     For the past 2 years, NFCU has violated both California and federal law by aggressively harassing the Scotts to make mortgage payments that NFCU knew under California law should have been deferred. Defendant further knew that it was charging improper fees and interest, and that its attempts to foreclosure or threaten

foreclosure were prohibited. NFCU took these actions even though NFCU fully knew at the time that MSG Scott was deployed on active duty military service, and that the Scotts were entitled to a 6-month deferral of their mortgage obligation under California law and the protections of the SCRA.

81.    When communicating with Defendant, Mrs. Scott attempted to get the company to state why it was denying the request and instead of return correspondence, or telephone call, NFCU continues to ignore her requests.

82.    NFCU's refusal to provide a deferral was in direct violation of California Military & Veterans Code section 800.

83.    Instead of complying with Mrs. Scott's request that NFCU follow the law, NFCU continued efforts to collect on the mortgage, continued to assert fees and interest in excess of 6%, and continued to threaten foreclosure.

84.    NFCU's handling of the Scott's Loan revealed that NFCU did not provide adequate training, procedures or guidance to its employees regarding compliance with the SCRA. Moreover, it appears that NFCU was unaware of the requirements of California Military & Veterans Code, and that there was no training, procedures, or guidance to its employees regarding NFCU's obligations to servicemembers as required by California and federal law.

**NATIONAL GUARD SOLDIERS WITH MULTIPLE PERIODS OF ACTIVE DUTY ARE PROTECTED BY THE SCRA AND CMVC**

85.    The CMVC and SCRA contemplate that National Guard soldiers, such as MSG Scott, may be deployed multiple times with multiple periods of active duty.

86.    "Military service" is defined under California law defined under California law as "full-time active state service or full-time active federal service . . . for a period in excess of seven days in any 14-day period." Cal. Military & Veterans Code § 400(b).

87.    In 2002, as part of A.B. 1433, the California Legislature enacted various provisions, including those found in § 405, protecting California military service

persons "in order to enable these persons to devote their entire energy to the defense needs of the nation or state." See Section 1(a) of Stats. 2002, ch. 60 (A.B. 1433). Such provisions were intended "to provide relief similar to that which is available under the [SCRA] to additional classes of servicemen and women in California" and that they would "be administered and interpreted as the [SCRA] is[.]" Id. (quoting letter from Jerome E. Horton to Chairman Burton); Cal. S. Jour., 2001-2002 Reg. Sess., No. 204). In signing A.B. 1433, then-Governor Davis stated: "The men and women who serve our state in the National Guard and who are called to active military service must leave their civilian jobs and sometimes experience financial hardships as a result of this service. . . . AB 1433 will ensure that equal protection is provided to all California National Guard members, as well as other reservists, who unselfishly put their civilian lives on hold to serve and protect millions of Californians." Cal. Assem. Jour., 2001-2002 Reg. Sess., No. 218 (Governor's Message – Assembly Bill No. 1433).

88.     Because of the intent expressed in the statues and by the legislatures, along with the guidance provided by the courts, the CMVC and SCRA should "be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." *Brewster*, 742 F.3d at 878.

89.     The United States Supreme Court ruled that the SCRA "must be read with an eye friendly to those who dropped their affairs to answer their country's call." *LeMaistre v. Leffers*, 333 U.S. 1, 6 (1948). This liberal interpretation applicable to the SCRA applies equally to the state-law equivalent, the CMVC.

90.     Based on the statute, reading the CMVC or SCRA to interpret reading "incurred by a service member before that person's entry into service[,]" specifically the word "service" to mean initial or first entry into service would be an unintended and unwarranted narrow reading of the statute. The definition of "military service" under both the CMVC and SCRA should be read consistent with the intent to protect persons "who unselfishly put their civilian lives on hold to serve and protect millions of Californians." For these reasons, that language refers only to obligations or

liabilities incurred during the service member's current service, and not to subsequent service periods.

## THE SCOTTS MADE A DEFERRAL REQUEST UNDER PENALTY OF PERJURY

91.     California Military & Veterans Code section 800 provides that a reservist may receive a mortgage deferral when called to active duty service in the United States armed forces. Military & Veterans Code § 800. The servicemember's request must be made via a "letter signed by the reservist, under penalty of perjury." Military & Veterans Code § 800(b)(1)(A). Initially, the Scotts made their request via NFCU's online messaging system. After NFCU denied the Scott's request for protections under the SCRA and CMVC, on  May 1, 2018, Mrs. Scott submitted a packet through the NFCU online messaging system, that contained signed forms under penalty of perjury titled "RE: Request for Deferral of Payment Obligation California Military and Veterans Code §§ 800-805" for all of the Scott's NFCU accounts, including their mortgage loan.

92.     Even though the Scott's complied with the requirements of California's Military and Veterans Code, by submitting a mortgage deferral request under penalty of perjury, NFCU continued to ignore and subsequently deny the Scott's deferral requests.

## TOLLING OF STATUE OF LIMITATIONS

93.     The three-year statute of limitations set forth in Cal. Civ. Proc. Code § 338(a) applies to claims under the Cal. Mil. & Vet. Code. *See Marion v. County of Los Angeles, 2009* WL 10670589, at \*11 (C.D. Cal.2009). Admittedly, federal law provides that any limitations period prescribed by law is tolled during the time that a service member is on active duty. *See* 50 U.S.C. § 526(a).

94.     Any statutes of limitations for the wrongful acts and omissions described in this complaint does not include the time period when MSG Scott was serving his country on active duty. "The period of a servicemember's military service may not be

included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrator, or assigns." 50 U.S.C. § 526.

95.     Section 526 (a) tolls the time period applicable for bringing any action by a covered servicemember for an amount of time equal to the person's period of military service. *Bretherick v. Crittenden County*, 2007 U.S. Dist. LEXIS 20213 (E.D. Ark. 2007) (stating that SCRA tolling provision is "crystal clear" in that the period of a servicemember's military service may not be included in computing any period limited by law). Tolling also occurs automatically. *Syzemore v. County of Sacramento*, 55 Cal. App. 3d 517 (1976). There is no discretion for the court to deny the tolling of an action. *In re Brandt*, 437 B.R. 294, 299 (Bankr. M.D. Tenn. 2010) (Courts have "uniformly concluded that 'may not' is mandatory, not permissive, offers no room for discretion, and that the provision tolls any statute of limitations, general or special, for the period of the service member's active duty.").

96.     California has enacted legislation conferring certain benefits, with regard to civil obligations, liabilities, and litigation, on certain military personnel called to active service or duty. Cal. Mil. & Vet. Code §§ 400 to 409.15, 800 to 813. California's Military and Veterans Code contains provisions comparable to the Servicemembers Civil Relief Act, limiting the enforcement of claims against debtors in military service. Cal. Mil. & Vet. Code § 400 et seq. The service members upon whom the benefits and protections are conferred are members of the militia, called or ordered into active state or federal service and members of an active or reserve component of the Armed Forces who is ordered into active duty pursuant to federal law. Cal. Mil. & Vet. Code § 400, subd. (d). Unless otherwise agreed by the parties following nonpayment or a breach, or unless previously court-ordered, state law prohibits any sale, foreclosure or seizure of a servicemember's secured real property during his or her military service and for one

1   year thereafter. Cal. Mil. & Vet. Code § 408(c) (amended Stats. 2018, Ch. 555, eff.

2   1/1/19)]

3       97.    Relevant to the allegations in this complaint, MSG Scott served on active

4   from January 29, 2018 through January 7, 2020 as his orders kept being extended and

5   January 13, 2020 to September 30, 2020,

6       98.    MSG Scott was on continuous active duty (Title 10 status) from January

7   29, 2018 through January 7, 2020.  (708 days on active duty) Then from January 13,

8   2020 to September 30, 2020 on Title 32 active duty orders; and additional service

9   thereafter.  MSG Scott has served over 969 days on active duty (a number that

10  continues to increase).  Those days are excluded from the calculation of any statutes of

11  limitations, such that the claims arising under this Complaint are timely.

12              **FIRST CLAIM FOR RELIEF – VIOLATION OF**

13              **CALIFORNIA MILITARY & VETERANS CODE**

14                       (Against All Defendants)

15      99.    MSG Scott and Mrs. Scott re-allege and incorporate by reference

16  paragraph 1 through 98 above as though fully set forth here.

17      100.   California law provides a private right of action for a violation of Military

18  & Veterans Code section 800: "A person violating any provision of this chapter shall

19  be liable for actual damages, reasonable attorney's fees, and costs incurred by the

20  service member or other person entitled to the benefits and protections of this chapter."

21  Military & Veterans Code § 812(a). To further ease the burden on citizen-soldiers and

22  encourage vindication of their rights, California law also provides that a "service

23  member or other person seeking to enforce rights pursuant to this chapter shall not be

24  required to pay a filing fee or court costs." Military & Veterans Code § 812(b).

25      101.   California Military & Veterans Code section 800(a) provides that "any

26  member of the United States Military Reserve or the National Guard of this state who

27  is called to active duty after the enactment of this chapter as a part of the Iraq and

28

Afghanistan conflicts may defer payments on any of the following obligations while serving on active duty: (1)  An obligation secured by a mortgage or deed of trust." That deferral may last up to 6 months. Military & Veterans Code § 800(d).

102.   MSG Scott is a member of the California National Guard who was called to active duty on January 29, 2018 as part of the Afghanistan conflict. MSG Scott's active duty service is lasted until September 30, 2020, but was then extended and is continuing to present.

103.   MSG Scott and Mrs. Scott repeatedly requested a deferral as provided by California law from Defendants.

104.   Defendants refused to provide the requested and required deferral. Instead, Defendants applied excessive interest and improper late fees, and harassed MSG Scott and Mrs. Scott into continuing to make payments on the mortgage obligation. In addition, Defendants have made adverse notations on the Scotts' credit reports that have severely degraded their credit and jeopardized MSG Scott's career.

105.   CMVC section 405 provides an interest rate cap of 6% during periods in which a soldier is on active duty. NFCU further violated California law when it asserted late fees and interest on the Loan in excess of 6% during the time that MSG Scott was on active duty, in violation of California Military & Veterans Code section 405.

106.   MSG Scott and Mrs. Scott were harmed as a result of Defendants' violation of Section 800 and Defendant's conduct was a substantial factor in causing that harm.

107.   As a proximate result of Defendants' intentional acts, MSG Scott and Mrs. Scott have suffered, and continue to incur damages including legal expenses and attorneys' fees in an amount to be proven at trial.

///

///

///

COMPLAINT

**SECOND CLAIM FOR RELIEF – VIOLATION OF SCRA**

(Against All Defendants)

108.   MSG Scott and Mrs. Scott re-allege and incorporate by reference paragraph 1 through 107 above as though fully set forth here.

109.   "Military service" for members of the Army, Navy, Air Force, Marine Corps or Coast Guard is defined under the SCRA as "active duty" within the meaning of 10 U.S.C. 101(d)(1). That provision, in turn, defines "active duty" as "full time duty in the active military service of the United States." A National Guard soldier activated into Title 10 service, such as MSG Scott, is thus only protected during the ***current*** period of active duty consistent with the SCRA definition.

110.   MSG Scott was called to active duty on January 29, 2018. The Scotts promptly notified NFCU as required by Section 527(b)(1) of the SCRA.

111.   At the time of the Scott's refinanced their purchase money mortgage for their home, in 2017, MSG Scott was not on active. Therefore, MSG was unquestionably not on active duty when the operative loan document was made effective. For this additional reason, the Scotts were entitled to protection under the SCRA when MSG Scott was against called to serve in his country on active duty.

112.   Despite receiving prompt notification of MSG Scott's call to active duty, NFCU took improper steps to foreclose of the Scott's home. Moreover, NFCU failed to reduce the total interest to 6%; instead, NFCU applied late fees and charges that caused the interest rate to exceed 6% in violation of the SCRA.

113.   MSG Scott and Mrs. Scott repeatedly requested the protections provided by federal law from NFCU.

114.   NFCU refused to provide the requested and required protections. Instead, NFCU applied excessive interest and improper late fees, and harassed MSG Scott and Mrs. Scott into continuing to make payments on the mortgage obligation. In addition, Defendants have made adverse notations on the Scotts' credit reports that have severely degraded their credit and jeopardized MSG Scott's career.

115.   The SCRA includes limitations on judicial proceedings, including attempts to foreclose on property while a member of the armed forces is on active duty. 50 U.S.C. § 501. In addition to refusing to limit the interest rate and fees, Defendants threatened to foreclose on the Scotts after MSG received orders to active duty. This threat—which was made after Defendants received notice of MSG Scott's orders, was a further and independent violation of the SCRA. MSG Scott and Mrs. Scott were harmed as a result of Defendants' violation of the SCRA and Defendant's conduct was a substantial factor in causing that harm.

116.   As a proximate result of Defendants' intentional acts, MSG Scott and Mrs. Scott have suffered, and continue to incur damages including legal expenses and attorneys' fees in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF – UNLAWFUL BUSINESS PRACTICE IN VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17200**

(Against All Defendants)

117.   MSG Scott and Mrs. Scott re-allege and incorporate by reference paragraph 1 through 116 above as though fully set forth here.

118.   NFCU at all times mentioned in this Complaint was engaged in the mortgage servicing business in California.

119.   The Scotts assert claims under the unlawful, fraudulent, and unfair prongs of the Unfair Competition Law ("UCL"), California Business and Professions Code section 17200.

120.   California Military & Veterans Code section 800(a) provides that "any member of the United States Military Reserve or the National Guard of this state who is called to active duty after the enactment of this chapter as a part of the Iraq and Afghanistan conflicts may defer payments on any of the following obligations while serving on active duty: (1)  An obligation secured by a mortgage or deed of trust." That deferral may last up to 6 months. Cal. Military & Veterans Code § 800(d).

///

COMPLAINT

121.   The SCRA and California law caps at 6% the interest rate on mortgage obligations for servicemembers called to active duty. Cal. Military & Veterans Code § 405; 50 U.S.C. App. § 527(b)(1).

122.   NFCU violated the unlawful prong of the UCL because NFCU violated the SCRA and California's Military & Veterans Code, as set forth below in 1-80, which are incorporated by reference here. The illegal acts include:

      a. Refusing to grant MSG Scott and Mrs. Scott a deferment of mortgage obligations during the time that MSG Scott was on active military duty and while recovering from the wounds he received in defense of the United States, in violation of California Military & Veterans Code section 800.

      b. Assessing improper late fees and charging interest in excess of 6% during the time that MSG Scott was on activity military duty, in violation of California and federal law.

      c. Threatening foreclosure and instituting collection proceedings and harassing MSG Scott and Mrs. Scott when each the Defendants fully knew at the time that MSG Scott was on active military duty, in violation of California and federal law.

      d. Causing negative credit reporting on the Scotts' credit with all three credit bureaus.

123.   NFCU also violated the unfair prong of the UCL. An unfair business practice occurs "when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *West v. JP Morgan Chase Bank, N.A.*, 214 Cal.App.4th 780, 806 (2013) (*citing Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal.App.4th 700, 719 (2001)). Furthermore, a practice is unfair if the reasons, justification, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to its victims. For the reasons set forth above, along with those set forth in paragraphs 1-80, incorporated by reference here, NFCU's business practices are

immoral, unethical, unscrupulous, and substantially injurious to consumers like the Scotts. NFCU is required to afford protections to servicemembers, such as MSG Scott, who are called to active duty to support their country. Yet, NFCU refuses to follow the law, and instead takes active steps to avoid or minimize its obligations to the detriment of consumer servicemembers and their families. NFCU's actions serve only the transparent purpose of avoiding their legal obligations at the expense of members of the armed services.

124.  NFCU also violated the fraudulent prong of the UCL. Defendant did so when the Scotts requested a deferral of the mortgage—as permitted by the CMVC—on both April 4, 2018 and May 1, 2018.

125.  On April 23, 2019, a NFCU representative informed Mrs. Scott that her accounts with NFCU did not qualify for the protections under the law because MSG Scott was only an "authorized user" on the account.

126.  Instead of deferring the Scott's mortgage loan payment, Defendant payment to $1,131.54, which is the principal and interest amount, excluding the escrow. When Mrs. Scott attempted to pay that amount, the payment system indicated that she still had a payment balance due. NFCU proceeded to charge interest in the Scott's loan payment and then placed the overage interest in the principle of the loan, instead of refunding it back to the Scotts. On May 3, 2018, NFCU's representative, Ms. Armstead disclosed that the reasoning for adding the overage interest into a servicemember's principle balance was to help servicemembers pay off their debt faster. Defendants then proceeded to take money out of the Scott's checking account without authorization. Defendant's ultimately denied the Scott's requests for relief under SCRACVMC.

127.  The statements by Defendants' representatives on were not true when made. As Defendants knew or should have known based on their review of the law that the Scotts were permitted to receive a six-month deferral of payments under the CMVC. Thus, statements that Defendants were not able to offer a deferral and their

denial of the Scotts' requests were misrepresentations that were contrary to Defendants' obligations under the law. Defendants affirmatively stated that it would not provide any deferral, even though the Scotts were entitled to one under California law.

128.   Defendants made the representations to the Scotts regarding the deferral with the intent of having the Scotts rely on those statements, which the Scotts did at the time.

129.   MSG Scott and Mrs. Scott have suffered injuries in fact as a result of the Defendants' unlawful, unfair, and fraudulent business practices. These include, among other things, improperly charged fees and interest, in an amount to be proven at trial.

130.   The gravity of the harm resulting from these unfair, fraudulent, and illegal acts and practices outweighs any conceivable reasons, justifications, or motives of NFCU for engaging in such deceptive acts and practices. By committing the acts and practices alleged here, NFCU has engaged, and continues to engage, in unfair, fraudulent, and illegal business practices within meaning of the UCL. NFCU has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading, and deceptive conduct.

131.   NFCU, through its unfair, fraudulent, and illegal business practices, has improperly obtained money from the Scotts and other consumers, and continues to improperly obtain money from the general public. The Scotts requests that this Court cause NFCU to restore this money to the Scott and the public, to order NFCU to disgorge profits obtained from improper collections of payments (including from the sale of loans that were the subject of NFCU's improper practices), and to enjoin NFCU from continuing to violate the UCL. Otherwise, the Scotts and members of the public will be irreparable harmed or denied an effective and complete remedy if such an order is not granted. The Scotts also request that this Court order a backward-reaching injunction in order to remedy the past effects of NFCU's unfair, fraudulent, and illegal business practices. MSG Scott and Mrs. Scott also seek an order under Business &

1   Professions Code section 17203 enjoining Defendants from assessing unlawful and

2   improper fees and interests, from engaging in unlawful and improper collection

3   practices, and from otherwise failing to comply with California and Federal protections

4   for servicemembers called to active duty military service.

5   **FOURTH CLAIM FOR RELIEF – BREACH OF CONTRACT**

6   (Against All Defendants)

7   132.   MSG Scott and Mrs. Scott re-allege and incorporate by reference

8   paragraph 1 through 131 above as though fully set forth here.

9   133.   The Scotts refinanced their purchase money mortgage for their home

10   located at Corona, California in July 2017. The Loan was backed by a written

11   agreement between the Scotts and NFCU.

12   134.   On April 2, 2019, the Scotts and NFCU entered into a Deferment

13   Agreement. The Deferment Agreement indicated that NFCU would deferred the

14   Scott's payments of the principal and interest on their loans for a period of six (6)

15   months from January 1, 2019 until June 30, 2019 with the understanding that the

16   Scott's monthly periodic payments would resume on July 1, 2019.

17   135.   The Scotts at all times performed all conditions, covenants, and promises

18   required on its part to be performed in accordance with the terms and conditions of

19   their Deferment Agreement with NFCU.

20   136.   Even though NFCU entered into an agreement with the Scotts that they

21   would defer their mortgage payments until June 30, 2019, on May 7, 2019, Mrs. Scott

22   received a letter from Veteran's Affairs that NFCU had informed them that the Scott's

23   mortgage loan payment was past due. Additionally, NFCU continued to report

24   delinquencies on MSG Scott's credit report.

25   137.   NFCU breached the parties' Deferment Agreement by failing to perform

26   their obligations by <u>failing to defer the Scott's mortgage payment until June 30, 2019.</u>

27   On July 1, 2019, NFCU sent the Scotts several letters stating that their loan was sixty

28   days past due.  These letters confused the Scotts because as per the Deferment

1  Agreement, the their payments were to resume on July 1, 2019.

2    138.   As a result of NFCU failing to satisfy their obligation under the
3  Deferment Agreement, MSG Scott's credit report had a 150 day late notation, while
4  the loan was supposed to be deferred.

5    139.   From August 19, 2019 to October 15, 2020, Mrs. Scott sent NFCU
6  several messages through their online messaging system, citing the California Military
7  and Veterans Code and inquiring as to why the Scott's account balances were
8  increasing if NCFU was abiding by the Deferment Agreement.

9    140.   The Scott's inquires went unanswered.

10    141.   As noted above, Defendants have failed and/or refused to perform their
11  obligations in full accordance with the Deferment Agreement.

12    142.   To date, and despite numerous requests, Defendants have failed to defer
13  the Scott's mortgage payments per their agreement and have failed to credit their
14  account for all the Scott's timely made payments.

15    143.   As a direct and proximate result of Defendants' material breach of the
16  Deferment agreement,  Plaintiffs have been damaged in an amount to be proven at
17  trial, plus prejudgment interest.

18    **FIFTH CLAIM FOR RELIEF – BREACH OF IMPLIED COVENANT OF**
19    **GOOD FAITH AND FAIR DEALING**

20    (Against All Defendants)

21    144.   MSG Scott and Mrs. Scott re-allege and incorporate by reference
22  paragraph 1 through 143 above as though fully set forth here.

23    145.   The Scotts refinanced their purchase money mortgage for their home
24  located at Corona, California in July 2017. The Loan was backed by a written
25  agreement between the Scotts and NFCU.

26    146.    The Loan Agreement contains an implied covenant of good faith and fair
27  dealing, which obligated Defendants to perform the terms and conditions of the
28  Agreement fairly and in good faith, and to refrain from doing any act that would

prevent or impede the Scotts from performing any or all of the condition of the contract, or any act that would deprive the Scotts of the benefits of its contract with Defendants.

147.   Defendants breached the implied covenant of good faith and fair dealing under the Agreement when they refused to comply with California or federal law, and refused to defer MSG Scott and Mrs. Scott's mortgage obligation when MSG Scott was serving on active duty. Defendants further breached the implied covenant of good faith and fair dealing when they applied excessive interest to the loan, charged improper late fees, and harassed the Scotts to make payments or threatened foreclosure when Defendants knew that MSG Scott was on active duty military service and entitled to a deferral of the mortgage obligation. Moreover, Defendants frustrated the purposes of the Loan Agreement when Defendants denied the Scotts' multiple deferral requests. Defendants' statement was not true when made, as Defendants knew or should have known.

148.   Defendants' refusal to comply with California or federal law, and refusal to defer MSG Scott and Mrs. Scott's mortgage obligation when MSG Scott was serving on active duty was intended by Defendants to deprive MSG Scott and Mrs. Scott of the benefits of the Loan Agreement, including the legal protections the Scotts are entitled to receive.

149.   As a direct and proximate result of the breach of the implied covenant of good faith and fair dealing by Defendants, MSG Scott and Mrs. Scott suffered damages in an amount to be proven at trial, including fees and interest that were improperly assessed or paid.

## FIFTH CLAIM FOR RELIEF – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

150.   MSG Scott and Mrs. Scott re-allege and incorporate by reference paragraph 1 through 149 above as though fully set forth here.

151.   By engaging in or permitting the unlawful and harassing collection efforts against MSG Scott and Mrs. Scott, and refusing to provide the deferment to which MSG Scott and Mrs. Scott were entitled, Defendants intended to cause MSG Scott and Mrs. Scott severe emotional distress and acted with reckless disregard of the probability of causing MSG Scott and Mrs. Scott severe emotional distress. Indeed, Defendants unlawful and improper conduct against MSG Scott and Mrs. Scott was intentional and part of a pattern and practice of unlawful and improper practices.

152.   Defendants' conduct toward MSG Scott and Mrs. Scott was outrageous.

153.   Defendants intended to cause MSG Scott and Mrs. Scott emotional distress or acted with reckless disregard of the probability that MSG Scott and Mrs. Scott would suffer emotional distress.

154.   MSG Scott and Mrs. Scott suffered severe emotional distress.

155.   MSG Scott and Mrs. Scott were harmed and Defendant's conduct was a substantial factor in causing that harm.

156.   As a proximate result of Defendants' intentional acts, MSG Scott and Mrs. Scott have suffered, and continue to suffer severe emotional distress, and incur damages including legal expenses and attorneys' fees in an amount to be proven at trial.

157.   Defendants acted with malice, oppression, fraud, and further acted in conscious disregard of MSG Scott and Mrs. Scott's rights. MSG Scott and Mrs. Scott are therefore entitled to an award of punitive damages from Defendants.

## SIXTH CLAIM FOR RELIEF – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

158.   MSG Scott and Mrs. Scott re-allege and incorporate by reference paragraph 1 through 157 above as though fully set forth here.

///

///

159.   Defendants were in a position of power over the Scotts, with the potential to abuse that power. The Scotts were in a vulnerable position because of their relative lack of power compared to Defendants. The Scotts were further in a vulnerable position because of the great disparity in bargaining power between them and Defendants, and the trust they placed in Defendants. These facts, and others, give rise to a duty of care owed by Defendants to the Scotts.

160.   Defendants knew or should have known that their negligence and failure to exercise due care in the performance of their obligations would cause the Scotts severe emotional distress.

161.   Defendants acted negligently by engaging in or permitting the unlawful and harassing collection efforts against MSG Scott and Mrs. Scott, and refusing to provide the deferment to which MSG Scott and Mrs. Scott were entitled.

162.   Defendants' conduct toward MSG Scott and Mrs. Scott was outrageous. MSG Scott and Mrs. Scott suffered severe emotional distress.

163.   MSG Scott and Mrs. Scott were harmed and Defendant's conduct was a substantial factor in causing that harm.

164.   As a proximate result of Defendants' breach of their duties, MSG Scott and Mrs. Scott have suffered, and continue to suffer severe emotional distress, and incur damages including legal expenses and attorneys' fees in an amount to be proven at trial.

165.   Defendants acted with malice, oppression, fraud, and further acted in conscious disregard of MSG Scott and Mrs. Scott's rights. MSG Scott and Mrs. Scott are therefore entitled to an award of punitive damages from Defendants.

## SEVENTH CLAIM FOR RELIEF—VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

### (Against All Defendants)

166.   MSG Scott and Mrs. Scott re-allege and incorporate by reference paragraph 1 through 165 above as though fully set forth here.

167.   15 USC Section 1681s-2(b) provides that furnishers of credit information to credit bureaus such as Equifax, Experian, and Transunion (the Credit Bureaus), have an obligation to ensure that they provide accurate information and upon receiving notice of a dispute, to conduct an investigation and report the results of such investigation to the reporting agencies.

168.   Over the period of time commencing shortly after MSG Scott was deployed to present, Defendants have provided inaccurate information to the three Credit Bureau regarding the status of the Scott's loans and other credit accounts with NFCU. These errors have included stating that the loans were behind periods of between 30 and 90 days, that payments were not being made, and that MSG Scott is on Active duty, which has a chilling effect on extensions of credit to the Scotts.  Even now, MSG Scott's credit report is showing late loans between 90-119 days and reflecting "late" on multiple months back to 2018.

169.   The Scotts have continuously monitored their credit and, when observed, have timely disputed the negative credit reporting.  Notwithstanding this reporting and disputed, the Scotts' credit continues to be repeatedly incorrectly reported on their credit reporting. Indeed, the problem became so bad, the NFCU stopped reporting the status of the Scotts' mortgage, which similarly had an adverse effect on their credit.

170.   NFCU's conduct was willful.  As a result of the violations of the FCRA by defendants, the Scotts have suffered damages and will incur attorneys' fees.

///

///

///

///

///

///

///

///

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs MSG WADE H. SCOTT and APRIL S. SCOTT pray for the following relief:

    A. For Compensatory Damages in an amount to be proven at trial;

    B. For Special Damages in an amount to be proven at trial;

    C. For Punitive Damages in an amount to be proven at trial;

    D. For a return of ill-gotten gains;

    E. For an order enjoining Defendants from engaging in unfair competition under Business & Professions Code § 17203;

    F. For attorneys' fees;

    G. For costs according to proof; and

    H. For such other relief as the Court seems just and equitable.

DATED: February 12, 2021       **CALIFORNIA MILITARY DEPARTMENT**

                                   */s/ T. Scott Belden*
                                   MG(CA) Jay M. Coggan
                                   Col (CA) T. Scott Belden
                                   1LT (CA) Jessica L. Zamora
                                   Attorneys for Plaintiffs
                                   MSG WADE H. SCOTT and APRIL S. SCOTT

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **DEMAND FOR JURY TRIAL**

Plaintiffs MSG WADE H. SCOTT and APRIL S. SCOTT demand a trial by jury.

DATED: February 12, 2021

**CALIFORNIA MILITARY DEPARTMENT**

_/s/ T. Scott Belden_
MG(CA) Jay M. Coggan
Col (CA) T. Scott Belden
1LT (CA) Jessica L. Zamora
Attorneys for Plaintiffs
MSG WADE H. SCOTT and APRIL S. SCOTT

1
DEMAND FOR JURY TRIAL